HERMAN SILVERMAN, Plaintiff, *v.* THE NATIONAL CITY BANK OF NEW YORK, Defendant.

Supreme Court, New York County, June 11, 1928.

*Morris Hillquit*, for the plaintiff.

*Shearman & Sterling* [*John A. Garver, Carl A. Mead* and *William Deering Howe* of counsel], for the defendant.

FRANK H. HISCOCK, Referee. This is an action to recover damages because of an alleged refusal on the part of the defendant to repay certain deposits made by plaintiff in its Petrograd branch. The complaint contained three counts, but one of these was dismissed upon the trial. Various defenses are urged by the defendant, many of which are similar to those presented in the case of Grabbe against the same defendant, herewith decided, there being, however, other defenses which are peculiar to this case.

During the month of November, 1917, the plaintiff, then apparently being a resident of the State of California, acting through the Los Angeles Security Trust and Savings Bank, directed the defendant at its main office in New York city to purchase for him 35,000 rubles, and to deposit the same to his credit in its Petrograd branch, and forwarded the money with which to purchase said rubles at the specified price. These directions were carried out by the defendant from its main New York office. It did not actually purchase the specified number of rubles in New York or anywhere else, but directed its Petrograd branch to transfer from a credit account which the main office had with the branch the specified number of rubles to the credit of plaintiff as a depositor. This deposit apparently remained intact to the credit of plaintiff until after September 1, 1918, when the Petrograd branch ceased functioning in Russia.

Between November 6, 1918, and March 31, 1919, a large amount of correspondence occurred between defendant and plaintiff and his representatives concerning this deposit. It would occupy too much

space to quote this at length. It may be briefly stated in substance that the correspondence in behalf of plaintiff emphasized his need for the money and sought the advice of the defendant as to some manner in which the deposit could be transferred from Petrograd to New York, and generally as to some manner in which he could realize on it. An illustration of the nature of the communications in behalf of the plaintiff is afforded by two quotations therefrom made in plaintiff's brief. The first of these is from a letter written by the Los Angeles bank reading as follows: " Dr. Silverman is in a very poor condition physically and needs these funds [referring to deposit] for his personal care, maintenance and support, and these funds constitute the only asset of any proportion with which to give him such maintenance. I am writing at this time to ask if some *transfer* cannot be made from your Branch at Petrograd to the main office in New York of this account, either in whole or in part, for the benefit of Dr. Silverman. I would appreciate a very clear and full explanation of the situation, if it is possible for you to give it to us." On February 13, 1919, the same bank wrote a letter to the Bankers Trust Company of New York, which was communicated to defendant, giving a detailed history of plaintiff's situation and of certain facts which will become important in a later discussion, and closing with the sentence: " I wish also to know for the benefit of our Ward [said Bank apparently having been appointed committee of Silverman in the meantime] as to whether or not the account in the Petrograd Branch by reason of payment of such drafts [drafts given by plaintiff on his account] having been stopped is available to be drawn upon by Dr. Silverman." Also, " I wish also for you to ascertain for us why the National City Bank is not directly responsible to Dr. Silverman and this Bank as his guardian for the payment upon demand of his account in their Petrograd Branch notwithstanding the Branch is closed. * * * It would appear to me that the National City Bank is directly responsible to Dr. Silverman for these rubles or for their exchange value at the time of his deposit and especially for the amount of purchase price therefor as the purchase was negotiated through the National City Bank."

In reply to the first letter, the defendant on November 18, 1918, answered in part as follows: " Replying to your letter of November 6th, regarding the account of Dr. Herman Silverman with our Petrograd Branch, we regret that very little can be done at this time about *transferring* any of this money to New York.

" As far as this Bank is concerned, it has not been in the market for rubles for a good many months, and we would, therefore, be unable to purchase Dr. Silverman's rubles ourselves.

"Practically the only way in which anything could be done would be for some friend or acquaintance of Dr. Silverman's who wanted the rubles, to buy Dr. Silverman's check."

In answering the last letter received from the Bankers Trust Company, the defendant referred to its situation in connection with said drafts which had been given by Silverman on his Petrograd account, and to which reference will be later made, and then it stated: "As to whether Dr. Silverman's account is available to him, we pointed out to you in our letter of January 27th that the account was theoretically subject to his order but that actually it was practically unavailable. He can of course draw drafts against this but the difficulty lies in disposing of any drafts drawn, as we have repeatedly tried to make clear that we would not buy these drafts ourselves and we do not know of any banking institution which would. We think the only way they could be disposed of would be to some friend or acquaintance in a transaction of a more or less personal nature.

"The National City Bank of New York fully recognizes the obligation of its Petrograd Branch to pay these rubles on demand to Dr. Silverman, provided governmental or political conditions do not make such demand and payment impossible, as of course is the case at present."

And on March 11, 1919, the defendant wrote a letter to the Bankers Trust Company "supplementing" its last letter and stating: "We beg to advise you that we are now informed by the Federal Reserve Board that a recent regulation of theirs forbidding the transfer of funds for the purchase of Russian rubles would also cover the purchase of ruble checks. Apparently, therefore, it would be absolutely impossible for Dr. Silverman to dispose of his rubles, unless of course he secured the approval of the Federal Reserve Board in the transaction."

These appear to be the last communications which passed between the parties in respect of realizing on this deposit.

Sometime prior to July 17, 1918, the plaintiff drew two drafts in favor of a man named Greenberg in this country upon his Petrograd account, respectively for 15,000 and 35,000 rubles, and these drafts were forwarded through the Bankers Trust Company to the National City Bank at its main office in New York for collection and thereafter were by it forwarded to its Petrograd branch, to be charged against plaintiff's account. Some complications and much correspondence with and by the defendant occurred in respect of these drafts. It appears that they were given by plaintiff to Greenberg to secure the latter against liability as a bondsman for plaintiff in criminal charges which were lodged against him by

the Federal government. Without quoting at length the correspondence, it may be stated that defendant at first was solicitously urged to follow up these drafts to its Petrograd branch and see that plaintiff's account was maintained in a condition to meet them, lest he might violate his arrangement with Greenberg and draw the money on his account, and the defendant undertook both by letter and telegram to accomplish this result.

Then later, the correspondence took the line of an attempt by defendant, at the request of the Los Angeles bank and the Bankers Trust Company, to ascertain whether the Greenberg drafts which had been forwarded to the Petrograd branch had reached their destination and the rubles been transferred to the credit of Greenberg. As late as February 13, 1919, the Los Angeles bank wrote the Bankers Trust Company a letter, already referred to, which was communicated to defendant, which in addition to other things, already partly referred to, contained the information of the dismissal of the criminal charges against Silverman which furnished the basis for the execution of the drafts to Greenberg; but this letter also contained the significant statement that " Mr. Greenberg has refused to make a draft for the return of the rubles to Dr. Silverman for the reason that he does not know and has no way of knowing whether or not he has received credit in the Petrograd Branch for such rubles."

As a matter of fact, the drafts appear never to have reached the Petrograd branch because of broken down lines of communication between this country and Russia, and continued to be outstanding against plaintiff's account.

Upon these facts and others similar to those appearing in the *Grabbe* case, the evidence in that case having been stipulated into this one, we come to the questions of law which have been presented by the parties. As stated, some of these questions are the same as were presented and decided in the *Grabbe* case and the decision in this case will be regarded as following the conclusions there reached without a full restatement thereof. This leaves for consideration certain questions which are peculiar to this case and did not arise in the former one.

I do not agree with the contention of the defendant that each of the transactions conducted by the plaintiff through the Los Angeles bank for the purchase and deposit of rubles in the Petrograd branch consisted of two distinct contracts, one for the purchase of rubles performed in New York and the other for a deposit effectuated in Russia. This I think would be a strained and unjustifiable view. What the plaintiff asked the defendant to do was to purchase for him a certain number of rubles and deposit

them to his credit in the Petrograd branch, and this the defendant did through the employment of credits in Russia. The acts performed in carrying out these instructions were simply steps leading to a single result and altogether they amounted to an entire contract, which was made between plaintiff and defendant in New York.

And equally I disagree with the apparent contention made by the plaintiff that he is entitled to either one of two remedies in this case, of which one would be recovery of damages for failure to repay his deposit and the other recovery of damages, as upon rescission, I suppose, because defendant failed to purchase and deposit to his credit rubles as directed. This latter claim as I understand it is built up on the theory that plaintiff directed the purchase and deposit in Russia of rubles, and that, defendant having failed to make repayment of the deposit, there has been a general failure of performance of its contract with plaintiff which entitles him to recovery. This theory in my opinion finds no foundation in the facts. Defendant completed its contract with plaintiff for the purchase and deposit of rubles. It is immaterial that it accomplished this result by the use of credits rather than by the actual purchase of rubles either in New York or Petrograd. The result was the same in either case. It created a credit to plaintiff as a depositor in its Petrograd branch just as he desired, and thereby it fully discharged the obligations of the original contract and incurred the new and different one which a bank owes to a depositor, and it is upon this obligation that the plaintiff must stand in this action.

On the theory that this is an action to recover damages for the failure of defendant to make repayment of a deposit, the plaintiff somewhat faintly claims that, by reason of the withdrawal from Russia of defendant's Petrograd branch, he was relieved of the necessity for making such a demand for repayment of his deposit as would ordinarily be a condition precedent to the prosecution of such an action as this. It seems to me that this claim is not open to the plaintiff under his complaint and the facts developed upon the trial. His complaint only alleges that defendant, on or about August 3, 1918, discontinued its Petrograd branch, and that thereupon it became impossible for him to demand or receive repayment of his deposit, whereas I am finding in this case that defendant did not discontinue its Petrograd branch on said date but at a date almost a month subsequent thereto.

Furthermore, plaintiff did not elect to treat the suspension of the Petrograd branch as a breach of contract and default in repayment of his deposit which entitled him to maintain an action.

We may assume that he could not have been compelled to make a demand for repayment of his deposit at any other place than at Petrograd branch and that, when that branch suspended so that a demand was impossible, he might have treated the circumstances as giving him a right to immediate action without further demand. But he was not compelled to take this position. He had a perfect right to waive this default and make a demand upon and institute proceedings against the defendant at its main office in New York, where his original contract was made, and this it is claimed was what he did. Without any assertion of breach or default because of the suspension in Petrograd, he entered upon extensive negotiations with the main office in New York concerning his Russian deposit and some means of transferring the same to New York or otherwise making it available. It is alleged in his complaint that this course amounted to a demand for and refusal of repayment in New York, at various times on and after November 6, 1918, and that is the substantial position taken by his counsel, not only in the complaint, but on the trial and in his brief, and is the claim upon which in my opinion he must succeed if at all.

The reasons for relieving a depositor from a demand for repayment of his deposit ordinarily are either that it was impossible to make the demand, or that it would have been useless, and under the course taken by plaintiff, neither of these conditions existed on September 1, 1918, when defendant discontinued its Petrograd branch, so long as plaintiff elected to transfer negotiations for repayment of his deposit to New York.

Still further, he cannot dispense with the ordinary condition precedent to the commencement by a depositor against the bank for repayment of his deposit, on the theory that he was excused from making a demand, if he would not have been entitled to have his demand complied with if it had been made. Excuse for non-performance certainly cannot be more effective than performance itself. In my opinion, if a demand had actually been made upon defendant's bank in Petrograd for the repayment of plaintiff's deposit, it would have been entitled to refuse to comply therewith because of the drafts which had been drawn upon his account by plaintiff and which were outstanding at this time. I shall discuss this phase of the case more fully hereafter.

Therefore, we come to what must be the reliance of plaintiff — that at various times on and after November 6, 1918, he made effective demands upon the defendant at its New York office for repayment of his deposits, which were unlawfully refused. These alleged demands were all made by correspondence con-

ducted in behalf of plaintiff by the Los Angeles bank and the Bankers Trust Company, and it does not seem to me that this correspondence, viewed as a whole, fairly sustains the claim that plaintiff was asserting a right to have his deposit repaid by defendant in New York and making a hostile demand therefor which would be the basis of an action. On the contrary, in my opinion it indicates an appeal to the defendant for advice as to some manner in which plaintiff's account could be "transferred" from Russia to New York and made available for his use. And defendant, in response to these appeals, was giving advice as to courses which it thought practical or impractical to accomplish this result, and expressing its opinion on various legal questions which it assumed to be involved. A fair interpretation of all of the correspondence does not make me feel justified in finding therein adequately expressed an attitude on the part of these parties dealing at arm's length wherein one said, "I demand repayment of my deposit," and the other said, "we refuse to give it to you."

Perhaps nothing makes this plainer than the language, already referred to, of plaintiff's agent, the Los Angeles bank, in a letter dated February 13, 1919, at the close of the correspondence between the parties, where the corresponding official writes (to the Bankers Trust Company): "I wish also for you to ascertain for us why the National City Bank is not directly responsible to Dr. Silverman and to this bank as his guardian, for the payment upon demand of his account in their Petrograd Branch notwithstanding the Bank is closed." In other words, thus far the parties had been discussing the question whether there was some method by which plaintiff could draw upon his Petrograd account or transfer his deposit to New York, and now, for the first time, the representative of the plaintiff is considering whether a direct demand upon defendant in New York for repayment of his deposits would be justifiable, and certainly he is not to be regarded as having performed an act, the advisability and legality of which he was still debating.

When we come to the other side of the controversy, of course the defendant could not be put in the position of having refused to comply with a demand when no demand was made, and at any rate, it did not take the position of presently refusing to repay plaintiff's deposit. Its last communication on this subject was dated March 6, 1919 (with an immaterial supplement dated March 11, 1919), in answer to the letter in behalf of plaintiff dated February nineteenth, to which reference has just been made. This communication is also somewhat historical, and in addition it discusses the availability of plaintiff's account and the possibility of disposing of drafts drawn thereon. And then, as a general definition

of its position, states that it " fully recognizes the obligation of its Petrograd Branch to pay these rubles on demand to Dr. Silverman, provided governmental or political conditions do not make such demand for repayment impossible, as of course is the case at present. * * * We simply sold Dr. Silverman so many rubles in our Petrograd Branch and he has no claim against us for anything but rubles in Petrograd."

It will thus be seen that these closing communications between the parties were nothing more than a somewhat historical and theoretical discussion of what their respective rights might be, and just as there was nothing in plaintiff's communication which amounted to a demand then and there upon defendant for repayment of his deposit, so there was nothing in the communication of defendant which amounted to a final and definite repudiation of what were his legal rights. Before it could be charged with such repudiation of its obligations, it was entitled to have a definite demand made upon it in assertion of the rights which plaintiff claims. A query in behalf of plaintiff whether he might not have certain rights against defendant, and a statement by defendant of what his and its rights were under the circumstances, were not a demand and refusal. They were a discussion which might ripen into such demand and refusal. It is true that, under certain circumstances, it might be claimed in behalf of plaintiff that even a discussion of relative rights indicated so clearly that defendant would not comply with plaintiff's rights and satisfy his demands, that it was not necessary for him to make any actual and formal demand. The benefit of this theory, however, cannot be invoked on this phase of plaintiff's case, because he stands squarely and exclusively upon the allegations of his complaint that a demand was made, and not that he was excused from making a demand because the defendant had indicated that it would be futile.

In addition to what has been said, there were special circumstances which, as it seems to me, barred plaintiff from demanding repayment of his deposit during all or a large part of the time covered by the evidence in this case. As early as July, 1918, Silverman had drawn upon his Petrograd deposit two drafts in favor of one Greenberg which more than exhausted his account, and these drafts had been delivered to the defendant for so-called " collection." The drafts had been drawn and delivered for an ample consideration and defendant was fully so advised, and it forwarded the drafts to the Petrograd branch *for collection* on or about July 8, 1918, with instructions to place the proceeds to the credit of Greenberg. Thereafter, and on or about July 30,

1918, there was transmitted to it through the Bankers Trust Company, a request on behalf of the Los Angeles Bank, which represented plaintiff in all of these transactions, that defendant cable its Petrograd branch to hold plaintiff's funds until arrival of drafts, taking such action as might be necessary to accomplish this action, if any. This request was stated to be made because of fear that Silverman might somehow withdraw his funds before the drafts could reach the Petrograd branch. Apparently this request upon the defendant was complied with. Then a further communication was received by the defendant from the Los Angeles bank, asking it to disregard this prior request, but requesting it to obtain advice by cable of its Petrograd branch on the arrival of the drafts and whether remitted or credited. The defendant attempted to comply with this request, but owing to the fact that telegraphic communications with Petrograd had been suspended, it was unable to do so.

As a matter of fact, it now appears that the drafts did not reach the Petrograd branch before it suspended operations and possession of them has never been recovered. January 14, 1919, the defendant, through the Bankers Trust Company, was for the first time advised by the Los Angeles bank that the ownership of these funds had passed from Greenberg to the " estate " of Silverman, and that it desired to have the drafts returned to it; but it also was advised that Greenberg refused to do anything to accomplish a transfer of the funds back to Silverman or to his estate. It does not appear that this communication by the Los Angeles bank, asserting that the ownership of the deposit had passed to Silverman's estate, rested upon anything else than the mere statement of the bank, and there is nothing to show, if it was true, when the title to the deposit passed from his estate, which I assume to mean a receivership or guardianship, back to Silverman individually. It seems to me that under these circumstances plaintiff could not insist that his deposit should be repaid to him.

Of course, it is well settled, at least in this State, that a draft or check drawn on a deposit, even though for a good consideration, does not operate as a transfer thereof and that, without notice of such outstanding check or draft, a bank is not made liable because it pays out the deposit on some other demand. (*Laclede Bank* v. *Schuler*, 120 U. S. 511, 514.) But this was not an ordinary case. The defendant not only had notice of these drafts but it had possession of them, and while this possession was designated as being for " collection " and in some aspects was such, nevertheless, the defendant which had the drafts also had the deposit, through its branch, upon which the drafts were drawn. Still further, the

representative of plaintiff made a special request that defendant hold plaintiff's deposit for the arrival of the drafts, and when plaintiff's agent tried to have this instruction rescinded, defendant was unable to so do because of the suspension of telegraphic communications. In the meantime, the drafts, although not presented to and paid by the Petrograd branch, are outstanding against plaintiff's deposit made in that bank and the drawee thereof refused to do anything to transfer back to plaintiff his original rights in the deposit.

Under all these circumstances, it seems to me that the plaintiff was not entitled to have the deposit repaid to him, even though it should be assumed that the suspension of the Petrograd branch or his communications with the main office in New York under ordinary circumstances would have entitled him to have such repayment.

I find the same lack of evidence of the value of rubles at the time plaintiff's demand is claimed to have been made as existed in the *Grabbe* case. In addition to certain facts stipulated by the parties in the same form as in the *Grabbe* case, there was also stipulated that all of the evidence taken in the latter case should be regarded as introduced in this case.

Therefore, under the circumstances, I see no other course than to direct judgment in favor of defendant dismissing plaintiff's complaint, with costs.